SALISBURY *et al.*, Respondents, v. THE MARINE INSURANCE COMPANY OF ST. LOUIS, Appellant.

1. Merchandize was insured on the steamboat Georgia from St. Louis to Council Bluffs; the Georgia, being disabled by the loss of her chimneys, became unable to prosecute her voyage without repairs, and stopped at St. Joseph, on the Missouri river; the necessary repairs could be obtained only from St. Louis, and for this a detention of twelve days would be necessary. *Held*, that this was not such a breaking of the voyage as would justify the master in transhipping the property insured upon another boat; that by such transhipment the insurers became discharged.

*Appeal from St. Louis Court of Common Pleas.*

*Kasson*, with whom were *Hudson & Thomas*, for appellant, cited Phill. on Ins. § 1102, 979, 989 ; 2 M. & S. 247 ; 3 Sto. 351 ; 3 Johns. Ch. 93 ; 3 Johns. 321 ; 14 id. 138; 8 Mo. 99 ; Story on Bail. § 509 ; Millar's Ins. 394.

*Krum & Harding*, for respondents.

I. In cases of necessity or calamity during the voyage, the master is by law created agent for the benefit of all concerned, including the underwriters on cargo, and his acts done under such circumstances, in the exercise of a sound discretion, are binding upon all the parties in interest in the voyage. (Jordan v. Warren Ins. Co. 1 Story C. C. 342.)

II. If by perils of the navigation the voyage be broken up, or if the necessary repairs would require an unreasonable delay, the master is not only justified in transhipping his cargo, but, if he can do so, is bound to forward it by another vessel. (2 Phill on Ins. § 1602, 1624, 1632, 1635 ; Angel on Com. Carriers, § 187, 402 ; Abbott on Shipping, 366, 367, and notes ; 9 Johns. R. 17, 21 ; 4 J. Ch. R. 220 ; 12 J. R. 107 ; 1 Arnold on Ins. 179, 185.)

III. In this case, therefore, the appellant is liable, unless the transhipment was unjustifiable, and not an act which a prudent man acting in good faith for the benefit of all the parties in interest could do, or unless the appellant is discharged by the

operation of the clause in the policy : " No privilege of light-
ing, towing or reshipping, except on good keel-boats and barges
on the Ohio and Illinois rivers, and on the Mississippi above
St. Louis." And hereunder the respondents contend, 1. That
the facts, as found, establish the good faith of the master. 2.
They show the transhipment to have been made under circum-
stances which, considering the nature of the trade, viz., car-
rying goods destined for California by the overland route from
Council Bluffs, and, considering the peculiarities of the navi-
gation, not only justified the forwarding by the Kansas, but
made it the duty of the master, acting with prudence, to tran-
ship his cargo. (Field v. Citizens' Ins. Co. 11 Mo. 50, 56.)
Before the Georgia could have gone to St. Louis and returned,
the season for commencing the trip to California would be near
its close. The same time would have elapsed before the mas-
ter could have sent to St. Louis for a new chimney and have
repaired so as to be able to proceed with his voyage. In doing
either, the perils of navigation of the Missouri river could not
be overlooked by the master in making up his mind what he, as
a prudent man, acting for the best interests of all concerned,
ought to do. Another accident, serious or trivial, would or
might cause such further delay as to entirely frustrate the ob-
jects which the owners of the cargo had in shipping their goods
to Council Bluffs, viz., the conveyance of their property to
California that season.

Ryland, Judge, delivered the opinion of the court.

This was a suit upon a policy of insurance. The facts were
found by the court, and judgment rendered thereon for the
plaintiff. The only question here is, whether, upon the facts
found, the carrier was authorized to tranship the property in-
sured so as to subject the underwriters to a loss that subse-
quently occurred to the goods in the new bottom occasioned by
a peril insured against. The facts found are as follows : " On
the 31st day of March, 1853, the plaintiffs were possessed of

twelve wagons, and a lot of other merchandize, all valued in the policy hereinafter named at $1970 ; and the plaintiffs caused them at that date to be insured at that valuation in the open policy of John McMechan, issued by defendant ; and so the defendant accepted the risk in consideration of a premium of $49 25 paid to the company therefor, John McMechan being insured thereon for the benefit of plaintiffs.  The insurance was upon merchandize on the steamboat Georgia from St. Louis to Council Bluffs.  And said insurance was taken by endorsement in policy book, as customary, and as above stated, and for plaintiff's benefit.  Said steamboat Georgia departed on said voyage with the merchandize aforesaid on board, and proceeded in safety to a point on the Missouri river some distance above St. Joseph, where, in endeavoring to round a point, she was caught by an eddy, which she was trying to avoid, and forced towards the river bank, where her cabin was broken, and her chimneys were caught in a tree and broken off, so that one was lost in the river, and the other hung by attachment to the boat.  This chimney was saved and afterwards cut in two, and so put up to supply temporary chimneys by the hands of the boat, after her return to St. Joseph, but only serving as half chimneys.  The water was rising, and she could not make steam enough to go up with her cargo.  She returned to St. Joseph. This was a safe port to lie in, and there was ample room and warehouses for storage of her cargo ; or the boat could have remained there in security with all her cargo unmoved in safety on board, until she could have sent an order to St. Louis for new flues and received them at St. Joseph, where she could have readily put them up and proceeded on her voyage.  St. Louis was the nearest port where the necessary chimneys and repairs could have been procured.  It would have taken twelve days to have made the trip to St. Louis, put on the necessary repairs, and returned to St. Joseph, or to have sent to St. Louis for chimneys and put them up.  The only obstruction to her proceeding on the voyage with her cargo was her want of sufficient draft from loss of chimneys to keep up a sufficiently hot fire

to make steam enough for up navigation. It also appears that some boats can sometimes construct temporory flues out of common boards and sacking for the purpose of increasing the draft, and have so sometimes proceeded up stream for hundreds of miles with cargo on board, but that the Georgia was not so constructed as to be able to do so. As it was in this case, the Georgia at Council Bluffs made a contract with the Kansas steamboat by which the Kansas paid her a large proportion of her freight to accrue, and the whole cargo, including the merchandize in question, was transhipped to the Kansas, with which the Kansas left that port and proceeded towards Council Bluffs, and on her way, about the 20th of April, 1854, was by a peril of the river sunk. Part of said merchandize insured was lost, and part, being nine wagons, saved in a damaged condition. This property saved was worth $360. The whole amount insured was $1970. The salvage was therefore 18⅓ per cent. of the valuation in the policy. Applying this percentage to the actual invoice value, (which was $1910 50,) as required by the terms of the policy in case of partial loss, the actual damage to the plaintiffs was $1541 13 on July 1st, 1853. Due preliminary proof was offered, but waived by the company's refusal to pay upon other facts in the case. If the company became liable to pay, that liability was mature on the 1st July, 1854. Both steamboats were seaworthy at the time of their respective shipments of said cargo. The court find also, 1. That said loss of chimneys was the only hindrance to the Georgia's proceeding on her voyage ; and that without other repairs than above mentioned, as made by cutting one chimney into two, she returned in safety to St. Louis, her port of departure, and thence proceeded down the Mississippi without further repairs ; but that, without further repairs, she could not make sufficient steam to proceed from St. Joseph to Council Bluffs with her cargo. 2. That all needful repairs could have been made at moderate costs in forty-eight hours at St. Louis, whereupon she could have resumed and completed her voyage to Council Bluffs ; that but one new chimney was required from St. Louis ;

the other chimney, which had been cut in two, could have been riveted together and put up at St. Joseph, and also at St. Louis ; that the Georgia would have required but twelve days to have returned to St. Louis and repaired, and returned again to St. Joseph, and started on her voyage up with said cargo, which could in the meantime have been stored safely at St. Joseph. 3. That the Georgia could have remained safely at St. Joseph without any change of cargo; ordered and obtained, at reasonable cost, a new chimney from St. Louis ; put up both chimneys at St. Joseph, and after twelve days' delay thence from her arrival, which would have been all the detention necessary, could have proceeded on and accomplished the voyage insured in two or three days from that time. 4. That this merchandize was intended to proceed on the route to California with its owners, the plaintiffs, in that season, which commenced (for the departure of trains from various points from Council Bluffs down below St. Joseph, so far as Weston and Independence,) from the 1st of April to the middle of May; and the Georgia left St. Joseph on her return to St. Louis on the 18th of April, 1854. The interest on damages from July 1st, 1853, to the present time, is $171 49."

From these facts, the main question arises, will a detention for twelve days, on a voyage up the Missouri, from St. Louis to Council Bluffs, warrant the boat, originally undertaking to transport the goods, in transhipping them on another boat, so as to continue the policy on the goods in the new bottom ? The Georgia was disabled by the loss of one chimney and by her cutting the other into two parts in order to come down to St. Joseph, from immediately prosecuting her voyage up the Missouri. She returned to St. Joseph and there had a safe port. The goods were on board uninjured ; there were good and sufficient warehouses to store away the goods, and it would have taken about twelve days for the Georgia to have come down to St. Louis, and refitted and repaired, and returned to St. Joseph ready to proceed on her voyage. Or she might have remained in the port of St. Joseph in safety, with her cargo uninjured,

36—VOL. XXIII.

until she could have sent to St. Louis and have procured the necessary repairs, and have been ready for the trip again in twelve days. So the detention of twelve days is all that she had to justify her in making the transhipment.

This detention does not, in our opinion, break up this voyage, so as to make it the master's duty to tranship, or give him the privilege to tranship. Here, by the boat's running into an eddy, she had her chimneys carried away; one was entirely lost overboard, the other was lodged and retained, was cut into two parts, and put up so as to enable the boat to descend the river to the port of St. Joseph; but these, thus cut and shortened, were not of sufficient length to make draft sufficient to create steam enough to propel the boat up stream. There was no place to procure a chimney nearer than St. Louis. The boat came to a safe and sufficient harbor, and could have come on down to St. Louis, and procured a new chimney, have the other again put together by rivets and bands, making a sufficiently good chimney, and have returned to St. Joseph in twelve days, or might have all necessary repairs ordered from St. Louis, and in twelve days been ready to commence again ascending the river from the port of St. Joseph. Was it the duty of the master to make this transhipment? The goods were wagons— property not easily deteriorated by delay in delivery. Now suppose the Georgia had been run on a sand-bar in the night, with a falling river, and had been detained in making efforts to extricate herself from the bar for twelve days in vain: would this have been a sufficient cause to justify transhipment in a lighter vessel, so as to continue the policy in the goods in the new bottom? Surely not. The insurers did not estimate the rapidity with which the voyage was to be or could be made. The safety of the goods on the voyage, long or short, was their object. We are of opinion that the facts found here by the court did not amount to a breaking up of the voyage, or to such a disaster to the boat as would justify her in sending on the goods by a new bottom; that this transhipment was at the master's risk, and not at the insurers; it was for his interest

and not for the benefit of all. The insurers guaranty only the safe arrival of the goods. They do not guaranty the speedy arrival, nor do they incur any loss on account of the new delay in the voyage, unless the delay be produced by a peril insured against, and the cargo, in consequence of the damage occasioned by such peril, or of its perishable quality, be subject to deterioration by mere lapse of time; nor do the insurers guaranty by their general undertaking that the cargo shall arrive in time for an advantageous market; they have nothing to do with the fluctuations of the market. If the vessel be only partially injured, and might be repaired in a reasonable time and at reasonable cost, it is the duty of the master to do it, and to forward the goods in his own vessel. (Shultz et al. v. The Ohio Ins. Co., 1 B. Monroe, 336.) The detention of twelve days in this case is not an unreasonable delay. The master should have waited and made the repairs, and then proceeded on his voyage. His transhipment in this case can not be said to be for the general interest of all parties. No doubt that a master may tranship when his vessel has been so injured that repairs would be unreasonable, or the time required to make them so long, as to ruin the goods by delay. "By the contract, the ship owner and the master, as his agent, is bound to carry the goods to their destination in his own ship, if not prevented from doing so by some event which he has not occasioned and over which he has no control." (Shifton v. Thornton, 9 Adol. & El. 314.) "If, by reason of the damage done to the ship, or through want of necessary materials, she can not be repaired at all, or not without very general loss of time, the master is at liberty to procure another ship to transport the cargo to the place of destination. But if his own ship can be repaired, he is not bound to send the cargo by another, but may detain it till the repairs are made." (Abbott on Shipping, 448–9.) The general doctrine, however, clearly is, that if, by reason of stranding or some other unexpected cause, it becomes impossible to convey the cargo safely to its destination in his own vessel, the master is to do what a prudent man

would think most for the benefit of all concerned.  Tranship-. ment to the place of destination, if it be practicable, is the first object, because that is the furtherance of the original object. (Angel on Carriers, § 187.)  It is recognized as an undoubted doctrine of insurance law, that, if the original ship be disabled, and the master, acting with a wise discretion, as the agent of the merchant and the ship owners, forwards the cargo in another ship, such necessity and justifiable change of ship will not discharge the underwriter on the goods from liability for any loss which may take place on goods subsequently to such transhipment ; but, if this transhipment be without necessity, or without the underwriter's consent, he will be discharged.  If, in the course of the voyage, the ship becomes so disabled as to be incapable *by any means* at the master's disposal of being repaired at all, so as to take on the cargo, the master, as agent for all concerned, may procure another ship in which to forward the cargo to its port of destination; and, in such case, the change of ship does not discharge the underwriter on goods, freight or profits, from his liability for any loss on the subjects they have insured, which may occur subsequently to such change of ship.  (Arnold on Ins. 178–9.)

In the case of Field v. The Citizens' Ins. Co., (11 Mo. 50,) the original boat was so injured that she could not pursue her voyage; she stored her cargo safely and returned to St. Louis, where she was repaired.  She shipped her cargo, as she thought it her duty to do, but the master of the original boat insured made an agreement with the insurance company that they would be bound by their policies on the cargo in the new bottom.  He did not run the risk of transhipping, in the idea that the policy on his boat attached to the transhipped cargo.  He therefore made an agreement with the underwriters in relation to it.  It does not bear with any authority on this question.

We have carefully looked into the various decisions on this question, and become satisfied that the mere delay occasioned by waiting for the necessary repairs in this case, did not justify. and warrant the transhipment into the new bottom; and that the

underwriters are discharged from any loss subsequently happening to the cargo in the new bottom.

It was the duty of the master of the Georgia to have repaired it by taking proper steps, and the time necessary to repair is not unreasonable. He acted only for his own interest, disregarding the underwriters. Permit such an accident or such a disaster, under such circumstances, so easily repaired, and causing only a few days' detention in a safe port, the cargo uninjured, to justify the master in breaking up his voyage and changing the boat, and thereby causing the policy to attach on the cargo in the new bottom, and the rights and safety of underwriters must gradually give way and fall, without a principle to support and protect them.

Under this view, the judgment of the court below must be reversed, and, with the concurrence of the other judges, it is reversed accordingly.